UNDER SEAL

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAR – 4 2020

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

September 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SACR 20-00040-DOC |
| Plaintiff, | I N D I C T M E N T |
| v. | [21 U.S.C. § 846: Conspiracy to Distribute and to Possess with Intent to Distribute Oxycodone; 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution and Possession with Intent to Distribute Oxycodone; 18 U.S.C. § 1956(h): Conspiracy to Launder Monetary Instruments; 18 U.S.C. § 1956(a)(1)(B)(i): Concealment Money Laundering; 18 U.S.C. § 982(a)(1), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| HARRISON MARUJE MUREITHI, aka "Paul," "P," and "Mzito," XAVIER MUDUKI MABALE, aka "X," "Zash," and "Mluhya," DUNCAN MUTHONI WANJOHI, aka "Ziggy," "Little Duncan," "Cuzo," and "Irungu," LOUISE W. MUREITHI, PIERRE DELVA, JR., aka "Big Head," JUSTIN DOUGLAS COZART, DAMOON JOE NAVARCHI, aka "Joey," JOHN MICHAEL KORZELIUS, aka "Dr. K," and MAYRA BARRIOS, | |
| Defendants. | |

The Grand Jury charges:

COUNT ONE

[21 U.S.C. § 846]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Oxycodone was the generic name for a highly addictive prescription analgesic which was classified as a Schedule II controlled substance, meaning that it had a high potential for abuse, the drug had an accepted medical use with severe restrictions, and abuse of the drug or other substances could lead to severe psychological or physical dependence.  The highest dose of short-acting oxycodone available, and the dose most popular for the drug abusing population, was the 30 milligram ("30mg") tablet.

2.   "Cappers" were individuals who recruited indigent, drug-addicted, or otherwise vulnerable individuals (the "sham patients" or "capper-controlled patients") to obtain prescriptions for oxycodone from medical clinics.  Sham patients who obtained prescriptions did not have a legitimate medical need for oxycodone and intended to sell oxycodone obtained pursuant to the prescriptions (the "fraudulent oxycodone prescriptions") on the black market.

3.   ChiroMed was a group of chiropractic, medical, and wellness clinics in Los Angeles, Orange, and San Bernardino Counties.  ChiroMed provided pain management services at medical clinics in Santa Ana, California (the "Santa Ana Clinic"), Fontana, California (the "Fontana Clinic"), Huntington Park, California (the "Huntington Park Clinic"), Redondo Beach, California (the "Redondo Beach

1  Clinic"), and Inglewood, California (the "Inglewood Clinic"), among

2  other clinics.

3      4.    AJMC Holdings, LLC was a limited liability corporation that

4  was purportedly in the business of retail store sales, internet

5  sales, and consulting.  Defendant JUSTIN DOUGLAS COZART controlled a

6  bank account at U.S. Bank, with an account number ending in 0183, in

7  the name of AJMC Holdings, LLC (the "U.S. Bank Account").

8  B.    OBJECTS OF THE CONSPIRACY

9      5.    Beginning on a date unknown, and continuing to at least

10  January 30, 2020, in Los Angeles, Orange, and Riverside Counties,

11  within the Central District of California, and elsewhere, defendants

12  HARRISON MARUJE MUREITHI, also known as ("aka") "Paul," "P," and

13  "Mzito" ("H. MUREITHI"), XAVIER MUDUKI MABALE, aka "X," "Zash," and

14  "Mluhya," DUNCAN MUTHONI WANJOHI, aka "Ziggy," "Little Duncan,"

15  "Cuzo," and "Irungu," LOUISE W. MUREITHI ("L. MUREITHI"), PIERRE

16  DELVA, JR., aka "Big Head," COZART, DAMOON JOE NAVARCHI, aka "Joey,"

17  JOHN MICHAEL KORZELIUS, aka "Dr. K," and MAYRA BARRIOS, and others

18  known and unknown to the Grand Jury, conspired with each other to

19  knowingly and intentionally distribute and possess with intent to

20  distribute oxycodone, a Schedule II narcotic drug controlled

21  substance, in violation of Title 21, United States Code, Sections

22  841(a)(1), (b)(1)(C).

23  C.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

24       ACCOMPLISHED

25      6.    The objects of the conspiracy were to be accomplished, in

26  substance, as follows:

27          a.    Defendants COZART and NAVARCHI would operate medical

28  clinics in Los Angeles, Orange, and Riverside Counties, in part for

                                    3

1   the purpose of profiting from the sale of fraudulent oxycodone

2   prescriptions.

3        b.   Defendant BARRIOS, under the supervision of defendants

4   COZART and NAVARCHI, would oversee the day-to-day management of the

5   medical clinics, including the issuance of fraudulent oxycodone

6   prescriptions to sham patients.

7        c.   Defendant COZART would retain corrupt doctors and

8   physician assistants to write fraudulent oxycodone prescriptions in

9   exchange for cash payments.

10        d.   Defendant MABALE would recruit sham patients to obtain

11   fraudulent oxycodone prescriptions from the medical clinics.

12        e.   Defendants H. MUREITHI and WANJOHI would provide cash

13   to defendant MABALE to pay to the medical clinics for fraudulent

14   oxycodone prescriptions written to the sham patients.

15        f.   Defendant MABALE would meet sham patients outside of

16   the medical clinics and assist them in preparing medical files and

17   records falsely claiming the sham patient suffered from a condition

18   or injury that required pain management treatment.

19        g.   Defendant MABALE would pay cash to defendants COZART,

20   NAVARCHI, and BARRIOS, and others in return for fraudulent oxycodone

21   prescriptions written in the name of sham patients.

22        h.   Defendant KORZELIUS and other licensed physicians

23   (including unindicted co-conspirator "Doctor-1"), while acting and

24   intending to act outside the usual course of professional practice

25   and without a legitimate medical purpose, would meet with fraudulent

26   patients and provide them with prescriptions for oxycodone, among

27   other drugs.

28

1          i.    Licensed physician assistants (including unindicted

2    co-conspirators "Physician Assistant-1" and "Physician Assistant-2"),

3    while acting and intending to act outside the usual course of

4    professional practice and without a legitimate medical purpose, and

5    without supervision or direction from any licensed physician

6    including defendant KORZELIUS and Doctor-1, would meet with

7    fraudulent patients and provide them with prescriptions for

8    oxycodone, among other drugs.

9          j.    Defendant MABALE would purchase or otherwise obtain

10   from the sham patients the oxycodone they had received by filling the

11   fraudulent oxycodone prescriptions at pharmacies.

12         k.    Using cash provided by defendant H. MUREITHI,

13   defendants MABALE and WANJOHI would purchase bulk oxycodone from

14   other cappers, (including unindicted co-conspirators Capper-1 through

15   Capper-13), who had fraudulently acquired oxycodone.

16         l.    Defendants H. MUREITHI, MABALE, and WANJOHI would

17   package and ship bulk quantities of oxycodone to defendant DELVA and

18   others in Massachusetts via UPS and Federal Express.

19         m.    Defendant DELVA, and others, would pay cash to

20   defendant H. MUREITHI for bulk quantities of oxycodone that had been

21   shipped to Massachusetts, or advance funds to defendant H. MUREITHI

22   to be used for the purchase of bulk quantities of oxycodone that

23   would later be sold to defendant DELVA and others.

24         n.    Defendant L. MUREITHI would receive packages sent by

25   defendant DELVA and others containing cash paid to defendant H.

26   MUREITHI for oxycodone and would distribute the cash as directed by

27   defendant H. MUREITHI.

28

D.   OVERT ACTS

7.   On or about the following dates, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants H. MUREITHI, MABALE, WANJOHI, L. MUREITHI, DELVA, COZART, NAVARCHI, KORZELIUS, and BARRIOS, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On or about July 20, 2018, defendant MABALE proposed to a pharmacy owner an arrangement under which he would pay $8 per 30mg oxycodone pill, and estimated he would purchase 4,000 to 5,000 pills per month.

Overt Act No. 2:   On or about August 3, 2018, in a telephone call using coded language, defendants MABALE and WANJOHI discussed pharmacies that sham patients could visit to fill fraudulent oxycodone prescriptions.

Overt Act No. 3:   On or about August 27, 2018, in a telephone call using coded language, defendant BARRIOS informed defendant MABALE that an unidentified pharmacy would not fill prescriptions for oxycodone and that the pharmacy would return a fraudulent prescription to one of defendant MABALE's sham patients.

Overt Act No. 4:   On or about August 27, 2018, in a telephone call using coded language, defendant BARRIOS told defendant MABALE that defendant COZART believed defendant MABALE owed payments to the medical clinics for three sham patients.  Defendant MABALE responded that he planned to have lunch with defendant COZART to discuss the issue.

1    Overt Act No. 5:    On or about August 31, 2018, in a telephone
2    call using coded language, defendant MABALE instructed defendant
3    BARRIOS to write fraudulent oxycodone prescriptions for 90 oxycodone
4    pills each in the names of two sham patients.   Defendant MABALE also
5    instructed defendant BARRIOS to issue the prescription under the name
6    of Physician Assistant-3.   Defendant BARRIOS asked whether the sham
7    patients would fill the fraudulent oxycodone prescriptions at the
8    same pharmacy.   When defendant MABALE asked defendant BARRIOS about
9    her preference as to which pharmacy the sham patients should use,
10   defendant BARRIOS responded, "Do the same pharmacy so they don't make
11   a big deal."

12   Overt Act No. 6:    On or about August 31, 2018, in a text
13   message using coded language, defendant MABALE instructed defendant
14   BARRIOS that fraudulent oxycodone prescriptions for his sham patients
15   should be for a total of 90 oxycodone pills each.   Defendant BARRIOS
16   responded, "Ok."

17   Overt Act No. 7:    On or about September 18, 2018, in a
18   telephone call using coded language, defendant WANJOHI advised
19   defendant H. MUREITHI of a $14,000 withdrawal defendant WANJOHI made
20   at the bank and that defendant WANJOHI had obtained a cashier's check
21   for $8,550.   Defendant WANJOHI also updated defendant H. MUREITHI on
22   the quantities of oxycodone available from various cappers.

23   Overt Act No. 8:    On or about September 18, 2018, in a
24   telephone call using coded language, defendant MABALE informed a sham
25   patient ("Sham Patient-1") that Sham Patient-1 would visit a doctor
26   the following day, and that Sham Patient-1 should meet defendant
27   MABALE at 11:30 a.m. at a restaurant across from the Santa Ana
28   Clinic.

Overt Act No. 9:     On or about September 19, 2018, Physician Assistant-1 wrote Sham Patient-1 a fraudulent prescription for 75 30mg oxycodone pills.

Overt Act No. 10:     On September 19, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed defendant MABALE's use of $20,000 to purchase 1,379 oxycodone pills. Defendant H. MUREITHI instructed defendant MABALE to purchase an additional $5,000 in oxycodone pills.

Overt Act No. 11:     On September 19, 2018, in a telephone call using coded language, defendants H. MUREITHI and WANJOHI discussed how defendant WANJOHI disbursed $125,000 that he had received to purchase oxycodone from various cappers.  Defendant WANJOHI also informed defendant H. MUREITHI that defendants WANJOHI and MABALE intended to purchase fraudulent oxycodone prescriptions at the Fontana Clinic the next day.

Overt Act No. 12:     On or about September 19, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed the quantity of oxycodone pills defendant MABALE planned to purchase from other cappers.  Defendant H. MUREITHI also told defendant MABALE that defendant H. MUREITHI would bring $10,000 to the Fontana Clinic so that defendant MABALE could pay sham patients.

Overt Act No. 13:     On or about September 19, 2018, in a telephone call using coded language, defendant MABALE told defendant H. MUREITHI that defendant NAVARCHI planned to open a medical clinic in Anaheim, California in approximately two weeks.  Defendant MABALE said that he planned to meet with defendant NAVARCHI later in the week to learn the details.  Defendants H. MUREITHI and MABALE also

discussed various cappers from whom defendant MABALE planned to purchase oxycodone.

Overt Act No. 14:  On or about September 20, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed sham patients that would obtain fraudulent oxycodone prescriptions the following day.  When defendant H. MUREITHI asked how many pills one particular sham patient would be prescribed, defendant MABALE explained that the sham patient would be prescribed only 75 oxycodone pills because it was his first prescription, but that he would be prescribed 90 oxycodone pills thereafter.  Defendant MABALE also said that he had obtained a fraudulent MRI to put in the sham patient's file.

Overt Act No. 15:  On or about September 22, 2018, in a telephone call using coded language, defendant H. MUREITHI explained to defendant MABALE that he (defendant H. MUREITHI) would count the cash received from the sale of oxycodone, keep $20,000 for himself, and provide the remainder to defendant MABALE.  Defendant H. MUREITHI instructed defendant MABALE to use some of the cash to purchase oxycodone from Capper-7.

Overt Act No. 16:  On or about September 24, 2018, in a telephone call using coded language, defendant MABALE instructed defendant BARRIOS to write two fraudulent oxycodone prescriptions, but to leave the patient name blank.

Overt Act No. 17:  On or about September 29, 2018, in a telephone call using coded language, defendant MABALE informed defendant H. MUREITHI that defendant COZART was becoming upset over outstanding debts owed to the medical clinics for fraudulent oxycodone prescriptions.

1   Overt Act No. 18:   On or about October 1, 2018, in a telephone

2   call using coded language, defendant MABALE explained to defendant

3   COZART that pharmacies were refusing to fill fraudulent oxycodone

4   prescriptions because the DEA number printed on the prescriptions was

5   incorrect.   When defendant COZART asked defendant MABALE, "how many

6   scripts are you holding," defendant MABALE responded, "around four or

7   five."   Defendant COZART explained that there was a "misprint" on the

8   prescription pads, and that defendant MABALE's sham patients could

9   obtain replacement prescriptions at the Santa Ana Clinic, the Fontana

10  Clinic, or the Huntington Park Clinic.   Defendant COZART then

11  informed defendant MABALE that Capper-4 said, "Oh, X is holding some

12  of my scripts."   Defendant COZART purportedly responded to Capper-4,

13  "Look, that's none of my business. . . . You, you straighten it out

14  with [defendant MABALE]. . . . I don't get in the middle of that

15  shit."   In response, defendant MABALE informed defendant COZART that

16  defendant MABALE was not paying for Capper-4's fraudulent oxycodone

17  prescriptions, only those written to defendant MABALE's sham

18  patients.   Defendant MABALE also said that, with respect to defendant

19  MABALE's sham patients, "when they get the stuff, they bring it to

20  me."   Defendant COZART said that he understood.

21  Overt Act No. 19:   On or about October 3, 2018, in a telephone

22  call using coded language, defendant MABALE told defendant H.

23  MUREITHI that he prefers sham patients to visit the Santa Ana Clinic

24  rather than the Fontana Clinic because the doctor "writes what he is

25  told."   Defendants H. MUREITHI and MABALE then discussed cash given

26  to defendant MABALE to obtain fraudulent oxycodone prescriptions.

27  Overt Act No. 20:   On or about October 10, 2018, in a telephone

28  call using coded language, Capper-8 advised defendant H. MUREITHI

that she had collected 1,725 pills of oxycodone and expected to receive additional quantities in the next few days. Defendant H. MUREITHI said that he would have $30,000 or $40,000 in cash available to use to purchase any oxycodone pills Capper-8 could collect.

Overt Act No. 21:   On or about October 11, 2018, in a telephone call using coded language, defendant H. MUREITHI told defendant DELVA that defendant H. MUREITHI had sent messages to defendant DELVA via WhatsApp, the encrypted digital communication platform, but that defendant DELVA had not responded. Defendant H. MUREITHI asked defendant DELVA to update and activate his WhatsApp account. Defendant H. MUREITHI also informed defendant DELVA that defendant H. MUREITHI hoped to obtain oxycodone the following Monday and promethazine with codeine on Saturday.

Overt Act No. 22:   On or about October 13, 2018, in a telephone call using coded language, defendant H. MUREITHI advised defendant WANJOHI that three cappers, including Capper-8, were owed $56,277, $10,070, and $19,000, respectively, for oxycodone that had been purchased from them. Defendant H. MUREITHI also advised defendant WANJOHI that he would replenish defendant WANJOHI's cash supply with hundred dollar bills.

Overt Act No. 23:   On or about October 13, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed the total number of oxycodone pills that had been collected for a bulk shipment. Defendant H. MUREITHI told defendant MABALE that he wanted the oxycodone pills to be shipped on Monday.

Overt Act No. 24:   On or about October 15, 2018, in a telephone call using coded language, defendant H. MUREITHI instructed defendant L. MUREITHI to withdraw $7,000 from an unspecified bank account.

11

Defendant H. MUREITHI explained that when cappers call him to sell oxycodone, "you cannot tell them you do not have money." Defendant H. MUREITHI further explained that, every ten days, he typically spent $180,000 to purchase oxycodone pills.

Overt Act No. 25: On or around October 15, 2018, while inside of defendant H. MUREITHI's vehicle in Fullerton, California, defendants H. MUREITHI and MABALE possessed 13,677 pills of 30mg oxycodone, divided into seven clear plastic bags, hidden inside of a stuffed animal, packaged for shipment to Massachusetts.

Overt Act No. 26: On or about October 15, 2018, defendant MABALE entered Federal Express Office Print & Ship Center, in Fullerton, California ("FedEx Office"), to ship the package containing 13,677 pills of oxycodone to Massachusetts.

Overt Act No. 27: On or about October 15, 2018, shortly after departing from FedEx Office with defendant MABALE, in a telephone call using coded language, defendant H. MUREITHI told an unindicted co-conspirator ("Co-conspirator 1"), "we were able to, uh, put things together and then after that, uh, we sent."

Overt Act No. 28: On or about October 16, 2018, in a telephone call using coded language, defendant H. MUREITHI instructed defendant WANJOHI to meet Capper-9 at an Applebee's restaurant to purchase 620 oxycodone pills for $11,470.

Overt Act No. 29: On or about November 9, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed preparing oxycodone pills for shipment, including whether to split the oxycodone pills across two packages in order to minimize any potential loss that would result from a law enforcement seizure.

Overt Act No. 30:   On or about November 10, 2018, in a text message using coded language, defendant BARRIOS informed defendant COZART that she had collected $4,500 in cash for fraudulent oxycodone prescriptions and paid $500 to Physician Assistant-2.

Overt Act No. 31:   On or about November 10, 2018, in a text message using coded language, defendant COZART told defendant BARRIOS, "Don't release the scripts for [Capper-2] till he pays."

Overt Act No. 32:   On or about November 10, 2018, in a text message, defendant BARRIOS responded to defendant COZART, "Ok. I held [an unindicted co-conspirator's ("Capper-1")] too.  Her niece said to give it to her on Tues[day]."

Overt Act No. 33:   On or about November 11, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed a package of oxycodone pills that had not arrived in Massachusetts.  Defendant H. MUREITHI said that defendant DELVA would loan $200,000 to them and that defendant MABALE should use $50,000 of that sum to purchase oxycodone pills.  Defendant H. MUREITHI also instructed defendant MABALE to stop advancing cash to cappers from whom defendant MABALE purchased oxycodone pills.

Overt Act No. 34:   On or about November 12, 2018, in a telephone call using coded language, defendant BARRIOS explained to defendant MABALE that defendant COZART had forbidden her from providing fraudulent oxycodone prescriptions to defendant MABALE until defendant MABALE paid an outstanding balance of $600.

Overt Act No. 35:   On or about November 13, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed ten new sham patients who would obtain fraudulent oxycodone prescriptions from defendant COZART's medical clinics.

13

1  Defendant MABALE said that defendant COZART was upset over an
2  outstanding balance owed for fraudulent oxycodone prescriptions.
3  Defendant H. MUREITHI said that he expected to receive a shipment of
4  cash from which defendant MABALE could pay the outstanding balance to
5  defendant COZART, plus the cost of fraudulent oxycodone prescriptions
6  for the ten new sham patients.

7      Overt Act No. 36:   On or about November 13, 2018, in a
8  telephone call using coded language, defendant H. MUREITHI instructed
9  defendant WANJOHI to provide $10,000 to $20,000 to defendant MABALE
10 for the purchase of oxycodone pills.  Defendant H. MUREITHI informed
11 defendant WANJOHI of a new cash-on-delivery policy, replacing a
12 practice of "giving people money up front to go get" oxycodone pills.
13 Defendant H. MUREITHI also informed defendant WANJOHI that defendant
14 DELVA would be delivering $100,000 in cash to defendant H. MUREITHI
15 over the weekend.

16     Overt Act No. 37:   On or about November 13, 2018, in a
17 telephone call using coded language, defendant BARRIOS advised
18 defendant MABALE that defendant NAVARCHI had requested the name and a
19 patient file for any sham patient that defendant MABALE intended to
20 bring to the Huntington Park Clinic.  Defendant BARRIOS also advised
21 defendant MABALE that a security guard would collect payments for
22 fraudulent oxycodone prescriptions.  Defendant BARRIOS also
23 complained that the security guard was helping sham patients complete
24 patient intake forms.

25     Overt Act No. 38:   On or about November 13, 2018, in a
26 telephone call using coded language, defendant H. MUREITHI told
27 defendant MABALE that Capper-9 and Capper-10 possessed 400 and 600
28

1  pills of oxycodone, respectively, and that defendant MABALE needed to
2  purchase 5,000 to 6,000 oxycodone pills by Friday.

3  Overt Act No. 39:   On or about November 14, 2018, in a
4  telephone call using coded language, defendant H. MUREITHI advised
5  defendant L. MUREITHI that UPS packages containing cash would be
6  delivered to her residence.   Defendant L. MUREITHI told defendant H.
7  MUREITHI that it was unfair that defendant H. MUREITHI suffered the
8  entire financial loss of a seized package of oxycodone rather than
9  sharing the loss with the cappers from whom he had purchased the
10  oxycodone pills.

11  Overt Act No. 40:   On or about November 14, 2018, in a
12  telephone call using coded language, defendants H. MUREITHI and
13  MABALE discussed an incoming shipment of cash which defendant H.
14  MUREITHI intended to use to pay defendant COZART.   Defendant H.
15  MUREITHI said to defendant MABALE, "Put [defendant COZART] on the
16  phone with me and I will tell him, 'listen, there is something I'm
17  waiting for and the minute I get it, I'm on my way to you.   You will
18  get paid in full.'"

19  Overt Act No. 41:   On or about November 14, 2018, in a
20  telephone call using coded language, defendant H. MUREITHI advised
21  defendant MABALE that he had received a shipment of cash.   Defendant
22  H. MUREITHI instructed defendant MABALE to count the cash using a
23  money counter and to keep the doors of his home closed while he did
24  so.   Defendant MABALE then advised defendant H. MUREITHI that cappers
25  would not provide oxycodone pills to defendant MABALE until they were
26  paid.

27

28

Overt Act No. 42:   On or about November 14, 2018, in a text message using coded language, Capper-8 advised defendant H. MUREITHI that Capper-8 had 2,593 oxycodone pills available for purchase.

Overt Act No. 43:   On or about November 14, 2018, in a telephone call using coded language, defendant COZART told defendant NAVARCHI that, because Capper-2 did not bring any sham patients to the Fontana Clinic, there was a net loss of $1,500 for the day. Defendants COZART and NAVARCHI also discussed the expected number of sham patients expected to visit the Huntington Park Clinic that week.

Overt Act No. 44:   On or about November 14, 2018, in a telephone call using coded language, defendant H. MUREITHI advised defendant L. MUREITHI that a package of cash had been sent to her via UPS, rather than Federal Express as usual.  Defendant H. MUREITHI said that once the package arrived, defendant H. MUREITHI would send defendant WANJOHI to pick it up from her.

Overt Act No. 45:   On or about November 17, 2018, in a text message and a recorded telephone call, defendant BARRIOS told defendant COZART that she had collected $9,500 in cash from sham patients that day.

Overt Act No. 46:   On or about November 19, 2018, defendant BARRIOS deposited $8,400 into the U.S. Bank Account.

Overt Act No. 47:   On or about November 19, 2018, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed collecting a total of approximately 750 oxycodone pills.  Defendants H. MUREITHI and MABALE also discussed meeting with defendant DELVA once the oxycodone pills were collected.

Overt Act No. 48:   On or about November 19, 2018, in a telephone call using coded language, defendants MABALE and BARRIOS

16

1   discussed the quantity of oxycodone pills that had been prescribed to

2   two sham patients.  Defendant BARRIOS explained that Physician

3   Assistant-2 would only write fraudulent oxycodone prescriptions for

4   150 oxycodone pills for those patients who had received that amount

5   in the past.  Defendants MABALE and BARRIOS also discussed an

6   associate of defendant BARRIOS who planned to sell oxycodone pills to

7   defendant MABALE.  When defendant MABALE informed defendant BARRIOS

8   that he had not yet obtained oxycodone pills from defendant BARRIOS's

9   associate, defendant BARRIOS responded, "he may have told you he had

10  pills with having the pills first.  Because those two [fraudulent

11  oxycodone prescriptions] he just got, he just got them verified.  I

12  know that for a fact because the pharmacist called me."

13      Overt Act No. 49:   On or about November 19, 2018, in a

14  telephone call using coded language, defendant BARRIOS told defendant

15  MABALE that her associate had obtained two fraudulent oxycodone

16  prescriptions that day, each for 120 oxycodone pills.

17      Overt Act No. 50:   On or about November 19, 2018, in a

18  telephone call, defendant COZART agreed to meet with defendant

19  KORZELIUS in order to pay defendant KORZELIUS for writing fraudulent

20  oxycodone prescriptions.

21      Overt Act No. 51:   On or about November 19, 2018, defendant

22  COZART issued a check to defendant KORZELIUS in the amount of $4,000

23  drawn on the U.S. Bank Account.

24      Overt Act No. 52:   On or about November 20, 2018, in a

25  telephone call using coded language, Capper-1 told defendant COZART

26  that Doctor-1 would not verify the legitimacy of fraudulent oxycodone

27  prescriptions when called by pharmacies, and for that reason, Capper-

28  1 preferred for Physician Assistant-2 to write fraudulent oxycodone

1  prescriptions for Capper-1's sham patients.   Defendant COZART
2  instructed Capper-1 to take her sham patients to the Redondo Beach
3  Clinic because Physician Assistant-2 would be there and Capper-1's
4  patients would have priority.   Defendant COZART also told Capper-1
5  that Doctor-1 was paid an incentive based on the volume of
6  prescriptions written.
7      Overt Act No. 53:   On or about November 20, 2018, in a
8  telephone call using coded language, defendants H. MUREITHI and
9  MABALE discussed an upcoming meeting with defendant DELVA, who had
10 traveled to southern California.   Defendants H. MUREITHI and MABALE
11 also discussed purchasing boxes from a UPS Store to use to ship
12 oxycodone pills to Massachusetts.
13     Overt Act No. 54:   On or about November 20, 2018, in a text
14 message using coded language, Capper-8 notified defendant H. MUREITHI
15 that Capper-8 had 1,603 oxycodone pills available for purchase.
16     Overt Act No. 55:   On or about November 20, 2018, in a
17 telephone call using coded language, defendant BARRIOS told defendant
18 MABALE that she felt uncomfortable with certain associates of
19 defendant COZART, including a security guard who collected cash
20 payments from sham patients.
21     Overt Act No. 56:   On or about November 20, 2018, in a
22 telephone call using coded language, defendant NAVARCHI confirmed
23 that Doctor-1 was writing fraudulent oxycodone prescriptions that
24 day, not Physician Assistant-2.   Defendant COZART instructed
25 defendant NAVARCHI to pay Physician Assistant-2 $500 or $600 in cash
26 and "send her out."
27     Overt Act No. 57:   On or about November 21, 2018, in a
28 telephone call using coded language, defendant MABALE explained to

18

1  defendant BARRIOS that an unindicted co-conspirator ("Co-conspirator

2  6") would pay defendant BARRIOS for a fraudulent prescription for 90

3  oxycodone pills.

4       Overt Act No. 58:   On or about November 21, 2018, in a

5  telephone call using coded language, defendant MABALE told defendant

6  H. MUREITHI that defendant DELVA left defendant MABALE's residence

7  immediately after obtaining oxycodone pills.   Defendant MABALE also

8  told defendant H. MUREITHI that defendant MABALE had left cash for

9  defendant COZART at a medical clinic, but that defendant COZART

10 claimed in a text message that he (defendant COZART) had not received

11 it.

12      Overt Act No. 59:   On or about November 21, 2018, in a

13 telephone call using coded language, defendant BARRIOS reported to

14 defendant COZART that she had collected $1,900 from sham patients,

15 and that she would deposit $2,300 into the U.S. Bank Account later

16 that day.

17      Overt Act No. 60:   On or about November 25, 2018, in a

18 telephone call using coded language, defendant H. MUREITHI told

19 defendant MABALE that a package of oxycodone pills had been received

20 in Massachusetts and that defendant H. MUREITHI would likely receive

21 cash payment soon, perhaps via next-day shipment.   Defendants H.

22 MUREITHI and MABALE then discussed cappers who had oxycodone

23 available for purchase.

24      Overt Act No. 61:   On or about November 26, 2018, in a

25 telephone call using coded language, defendant COZART told Physician

26 Assistant-2 that she should "just see pain patients" whenever she

27 wanted at the Redondo Clinic because Doctor-1 was "greedy" and wanted

28 the Huntington Park Clinic "all to himself."   Defendant COZART

19

1  advised Physician Assistant-2 that she should not prescribe 120 or
2  more oxycodone pills in a single prescription because defendant
3  COZART did not "want somebody coming in to us and say[ing] we're
4  over-utilizing opioids."  Defendant COZART said the other reasons not
5  to prescribe 120 oxycodone pills in one fraudulent prescription was
6  because "these people, these patients, they start running their
7  mouth.  And then they're going to say, 'Yeah, she wrote me 120.'  And
8  then you got all these jackasses coming to you [saying] 'Oh, no,
9  increase mine.'"  Physician Assistant-2 asked whether the rule
10 applied "regardless of the marketer" who brought the patient.
11 Defendant COZART responded that Physician Assistant-2 had to "be
12 careful.  Make sure it's all documented.  There has to be, you know,
13 [a] significant reason why they would get that."
14     Overt Act No. 62:  On or about November 26, 2018, in a
15 telephone call using coded language, defendants H. MUREITHI and
16 MABALE discussed defendant MABALE's purchase of approximately 2,200
17 oxycodone pills.
18     Overt Act No. 63:  On or about November 27, 2018, in a
19 telephone call using coded language, defendant BARRIOS told defendant
20 MABALE that, should pharmacists call to verify fraudulent oxycodone
21 prescriptions, defendant BARRIOS would not verify them unless she had
22 been paid for them.
23     Overt Act No. 64:  On or about November 27, 2018, in a
24 telephone call using coded language, defendant COZART told defendant
25 NAVARCHI that Capper-1 had obtained Physician Assistant-2's telephone
26 number and was requesting that Physician Assistant-2 write
27 prescriptions "on the side."  Defendant COZART said that, according
28 to Capper-2, Capper-1 had gone to prison for three years "for doing

1  this shit."  Defendant COZART further observed that Capper-1's
2  association with the medical clinics would bring unneeded attention
3  to them.

4      Overt Act No. 65:  On or about November 28, 2018, in a text
5  message, defendant BARRIOS forwarded to defendant COZART a text
6  message she received from Capper-3 which stated, in substance, "Good
7  morning Mayra, how are you? Let me guess, we don't have a new doctor
8  yet?  If not, I'm not doing any appointments until we do.  Also, I
9  have 6 prescriptions that I want my money back for today.  They are
10  not taking them no matter where I go and I'm done running around
11  spending money and not making any.  I have been calling Justin no
12  response, no reply to my texts.  So fuck it.  I want my money."

13      Overt Act No. 66:  On or about November 28, 2018, in a
14  telephone call using coded language, defendants COZART and NAVARCHI
15  discussed the text message defendant BARRIOS had received from
16  Capper-3.  Defendant COZART said Capper-3 has been complaining about
17  defendant KORZELIUS's fraudulent oxycodone prescriptions "for a
18  while."  Defendant NAVARCHI said they should stop seeing Capper-3's
19  sham patients if Capper-3 was not "on board" and was not "savvy
20  enough with the script."  Defendant COZART suggested that Capper-3
21  should talk to defendant MABALE because defendant MABALE did not have
22  problems filling fraudulent oxycodone prescriptions, and that maybe
23  Capper-3 need to "work under" defendant MABALE.  Defendants COZART
24  and NAVARCHI also discussed fraudulent oxycodone prescriptions for
25  120 oxycodone pills written by Physician Assistant-2.  Although those
26  patients claimed to have had "terminal cancer," defendant NAVARCHI
27  said "[t]here's no paperwork in the file.  I looked in the files.
28  Like, they need to have some kind of bloodwork.  Some kind of

<div align="center">21</div>

1   documentation.  Cuz if they, if, God forbid, someone audits us

2   . . . But the patient just told the doctor [about the terminal cancer

3   diagnosis.]  I mean, you know?  I can say I have cancer too."

4   Defendants COZART and NAVARCHI agreed that all sham patients lie

5   about their maladies.

6      Overt Act No. 67:  On or about November 28, 2018, in a

7   telephone call using coded language, defendant MABALE informed

8   defendant BARRIOS that he planned to bring approximately ten sham

9   patients to an unspecified medical clinic in order to obtain

10  fraudulent oxycodone prescriptions.

11     Overt Act No. 68:  On or about November 28, 2018, in a

12  telephone call using coded language, defendants H. MUREITHI and

13  MABALE discussed a Federal Express package containing cash that had

14  been delivered to defendant MABALE.  Defendant H. MUREITHI instructed

15  defendant MABALE to meet defendant H. MUREITHI at the Santa Ana

16  Clinic with the cash.

17     Overt Act No. 69:  On or about November 28, 2018, in a

18  telephone call using coded language, defendant MABALE informed

19  defendant BARRIOS by text message that Sham Patient-2 had $200 to use

20  to purchase a fraudulent prescription, and that defendant MABALE

21  would pay the remaining $100.  Defendant MABALE requested that Sham

22  Patient-2 be issued a fraudulent prescription for 90 oxycodone pills.

23     Overt Act No. 70:  On or about November 29, 2018, in a

24  telephone call using coded language, defendants H. MUREITHI, MABALE,

25  and WANJOHI discussed the purchase of oxycodone pills from cappers.

26  Defendant H. MUREITHI said that defendant DELVA was delivering cash

27  to defendant H. MUREITHI, and that defendant H. MUREITHI would then

28

1  pay defendants MABALE and WANJOHI for the oxycodone pills they had

2  purchased from cappers.

3      Overt Act No. 71:   On or about November 29, 2018, in a

4  telephone call using coded language, defendants MABALE and BARRIOS

5  discussed which fraudulent oxycodone prescriptions had been purchased

6  using $2,500 given to defendant BARRIOS by defendant MABALE.

7      Overt Act No. 72:   On or about November 30, 2018, in a

8  telephone call using coded language, defendants COZART and NAVARCHI

9  agreed to split between themselves $3,000 that Capper-2 had paid for

10  fraudulent oxycodone prescriptions.

11      Overt Act No. 73:   On or about December 3, 2018, in a text

12  message using coded language, Capper-8 advised defendant H. MUREITHI

13  that Capper-8 had 1,408 oxycodone pills available for purchase.

14      Overt Act No. 74:   On or about December 4, 2018, in a telephone

15  call using coded language, defendants COZART and NAVARCHI discussed

16  the sham patients defendant MABALE and other cappers brought to the

17  medical clinics.  Defendant NAVARCHI noted that prescriptions for

18  30mg oxycodone pills were scrutinized by pharmacies and suggested

19  that sham patients should request a different dosage of oxycodone.

20  Defendant COZART responded, "Well, they're dumb motherfuckers.  I

21  mean, you know the reason why they want [30mg oxycodone pills]."

22  Defendant NAVARCHI said, "I know, but still."  With respect to

23  cappers, defendant COZART asked defendant NAVARCHI, "I mean, forget

24  the fact that what they do, that's illegal, would you want to fuckin'

25  do that?  Go pick up all those fuckin' crackheads.  Bring them to the

26  fuckin' clinic."  Defendants COZART and NAVARCHI also discussed

27  cappers' complaints about filling fraudulent oxycodone prescriptions

28  at pharmacies.  Defendant COZART commented, "[if] they can figure out

1  this hustle, they could figure out that hustle a lot fucking easier,

2  from what they're doing."  Defendant NAVARCHI responded, "[the

3  cappers] need to figure out that part," referring to filling

4  fraudulent oxycodone prescriptions, "more than our part," referring

5  to the purchase of fraudulent oxycodone prescriptions, "because our

6  part is not that difficult.  Just go get a fucking MRI and make sure

7  you have history.  It's not a big fucking deal.  It's not rocket

8  science."

9      Overt Act No. 75:   On or about December 4, 2018, in intercepted

10  text messages using coded language, defendant COZART communicated

11  with Capper-5, who was unable to find pharmacies that would fill

12  fraudulent oxycodone prescriptions written by defendant COZART's

13  medical clinics and sought a refund on payments made to the medical

14  clinics.  Defendant COZART wrote, "[Capper-4] I love ya but. . . . .

15  I'm not giving a refund. . . . . .   There's nothing wrong with the

16  doctor.  He's never been disciplined nor is he under any

17  investigation[.]   [H]undreds of people have no issue filling every

18  month so you need to figure out how to get your scripts filled . . .

19  . . the patient can see [Doctor-1] if they don't want to see

20  [defendant KORZELIUS] any more but the problem is not our doctor it's

21  your patient."  Capper-5 responded, in part, "I already tried over 10

22  pharmacy Justin come on now.  The Dr is burned out!! Too many people

23  with same everything!?!?!"

24      Overt Act No. 76:   On or about December 4, 2018, in a telephone

25  call using coded language, defendant H. MUREITHI advised defendant L.

26  MUREITHI that he expected to receive a package containing cash and

27  would meet with defendant L. MUREITHI after receiving it.   Defendant

28

1   H. MUREITHI instructed defendant L. MUREITHI to pay $11,600 to

2   defendant WANJOHI.

3       Overt Act No. 77:   On or about December 4, 2018, in a telephone

4   call using coded language, defendant WANJOHI told defendant H.

5   MUREITHI that he had $92,830 in cash on hand.

6       Overt Act No. 78:   On or about December 5, 2018, in a text

7   message, defendant BARRIOS wrote to defendant COZART, "We just

8   finished.  So I pay [Physician Assistant-1] 500?"

9       Overt Act No. 79:   On or about December 5, 2018, in a telephone

10   call using coded language, defendant H. MUREITHI told defendant L.

11   MUREITHI that a package containing cash had been seized by law

12   enforcement, falsely claiming that the seized package contained only

13   $70,000 in cash.  Defendant L. MUREITHI asked defendant H. MUREITHI

14   if there was oxycodone inside of his residence, and defendant H.

15   MUREITHI said no.  Defendant L. MUREITHI asked defendant H. MUREITHI

16   what defendant L. MUREITHI should tell police if defendant L.

17   MUREITHI was asked about other packages that had been shipped to

18   defendant L. MUREITHI's residence.  Defendant H. MUREITHI told

19   defendant L. MUREITHI that she should not worry about packages that

20   had been delivered because law enforcement was not aware of them.

21       Overt Act No. 80:   On or about December 5, 2018, in a telephone

22   call using coded language, defendant MABALE told defendant BARRIOS

23   about his efforts to purchase oxycodone from other cappers.

24       Overt Act No. 81:   On or about December 5, 2018, in a telephone

25   call using coded language, defendants COZART and NAVARCHI discussed

26   the number of sham patients various cappers brought to the medical

27   clinics and agreed to split amongst themselves $4,200 that defendant

28   BARRIOS planned to deposit into the U.S. Bank Account.

1      <u>Overt Act No. 82:</u>  On or about December 6, 2018, in a telephone
2  call using coded language, defendant H. MUREITHI told defendant L.
3  MUREITHI that shipping records indicated the package of cash sent by
4  defendant DELVA was in law enforcement custody.  Defendant H.
5  MUREITHI speculated that law enforcement discovered the cash because
6  it had not been wrapped properly.  Defendant L. MUREITHI asked, "who
7  is going to incur the loss?  You or him [defendant DELVA]?"
8  Defendant H. MUREITHI said that defendant DELVA would replace the
9  lost cash.  Defendant L. MUREITHI also suggested that defendant H.
10  MUREITHI remove the money counting machine from the house.

11      <u>Overt Act No. 83:</u>  On or about December 6, 2018, in a telephone
12  call using coded language, defendants COZART and NAVARCHI discussed
13  the need to monitor Physician Assistant-2's files and charts so that
14  her fraudulent oxycodone prescriptions would not raise suspicions
15  about Doctor-1, which could cause defendants COZART and NAVARCHI to
16  close down the medical clinics.  Defendant NAVARCHI informed
17  defendant COZART that Physician Assistant-2 was referred to on the
18  streets as the "juice lady" or the "120 lady," referring to,
19  respectively, promethazine with codeine cough syrup and oxycodone.

20      <u>Overt Act No. 84:</u>  On or about December 11, 2018, in a
21  telephone call using coded language, defendants COZART and NAVARCHI
22  discussed $5,100 in cash that had been earned that day at two medical
23  clinics.  Defendant NAVARCHI also told defendant COZART that some of
24  Capper-1's sham patients had visited the medical clinics without
25  Capper-1.

26      <u>Overt Act No. 85:</u>  On or about December 12, 2018, in a
27  telephone call using coded language, defendant COZART confirmed to an
28  unindicted co-conspirator ("Co-conspirator 4") that Capper-1 should

1   be charged only $200 if the fraudulent prescription was for

2   hydrocodone.

3        Overt Act No. 86:   On or about December 17, 2018, in a

4   telephone call using coded language, defendant COZART instructed Co-

5   conspirator 4 to keep Capper-1's sham patients separate from other

6   patients at the medical clinic.   Defendant COZART also instructed Co-

7   conspirator 4 to write a check to Physician Assistant-1 for $4,000

8   for hours worked at the medical clinic.

9        Overt Act No. 87:   On or about December 17, 2018, in a

10  telephone call using coded language, defendant H. MUREITHI informed

11  an unindicted co-conspirator ("Co-conspirator 2") that defendant H.

12  MUREITHI was prepared to ship oxycodone and asked Co-conspirator 2 to

13  provide the shipping address.

14       Overt Act No. 88:   On or about December 17, 2018, in a text

15  message, Co-conspirator 2 provided to defendant H. MUREITHI a

16  shipping address in Cambridge, Massachusetts.

17       Overt Act No. 89:   On or about December 17, 2018, in a

18  telephone call using coded language, defendant WANJOHI told defendant

19  H. MUREITHI that defendant WANJOHI planned to visit defendant

20  MABALE's residence to determine whether defendant MABALE had

21  packaging to use to ship oxycodone to Massachusetts.   Defendant H.

22  MUREITHI said he could bring a "teddy" or "buy some toy at Target."

23       Overt Act No. 90:   On or about December 17, 2018, in a

24  telephone call using coded language, defendant MABALE told an

25  unindicted co-conspirator ("Co-conspirator 3") that he "needed [Co-

26  conspirator 3] to do something for me real quick" in Anaheim that

27  afternoon.

28

1    <u>Overt Act No. 91:</u>   On or about December 17, 2018, defendants H.
2    MUREITHI, MABALE, and WANJOHI purchased packaging materials from a
3    UPS Store in Anaheim, California.   Defendant WANJOHI then purchased a
4    stuffed animal and red wrapping paper from Daiso Japan, located
5    within the same shopping plaza as the UPS Store.   Defendants H.
6    MUREITHI, MABALE, and WANJOHI then drove to defendant MABALE's
7    residence.

8    <u>Overt Act No. 92:</u>   On or about December 17, 2018, defendants H.
9    MUREITHI and MABALE and Co-conspirator 3 drove to Postal Express in
10   Anaheim, California.   Upon arrival, Co-conspirator 3 shipped a
11   package containing approximately 1,831 oxycodone pills, hidden inside
12   of a stuffed animal wrapped in red wrapping paper, to the name and
13   address in Cambridge, Massachusetts that had been provided by Co-
14   conspirator 2.

15   <u>Overt Act No. 93:</u>   On or about December 17, 2018, in a
16   telephone call using coded language, defendant H. MUREITHI told Co-
17   conspirator 2 that he had shipped 1,840 oxycodone pills via UPS.   Co-
18   conspirator 2 informed defendant H. MUREITHI that defendant H.
19   MUREITHI would be paid $42,320 (or approximately $23 per pill), some
20   of which would be sent by mail and some of which would be delivered
21   in person.   Defendant H. MUREITHI said his goal was to ship 2,000 to
22   3,000 oxycodone pills to Massachusetts per week, alternating between
23   UPS and Federal Express.   Defendant H. MUREITHI said he ultimately
24   wanted to ship 5,000 oxycodone pills per week by March.

25   <u>Overt Act No. 94:</u>   On or about December 18, 2018, in a
26   telephone call using coded language, defendant BARRIOS told defendant
27   MABALE that, during the week of Christmas, the Santa Ana Clinic would
28   be open on Wednesday and the Huntington Park and Fontana Clinics

would be open Thursday.  Defendant BARRIOS said that defendant NAVARCHI was supposed to pay defendant COZART's share of the money earned from the sham patients that day to her, but that he had not done so because defendant BARRIOS purportedly owed money to the clinics.

Overt Act No. 95:   On or about December 18, 2018, in a telephone call using coded language, defendants H. MUREITHI and L. MUREITHI discussed a physician based in Irvine, California who was arrested by law enforcement for writing fraudulent oxycodone prescriptions for sham patients.  Defendant L. MUREITHI asked defendant H. MUREITHI whether he sent any of his sham patients to any physicians in Irvine, California.  Defendant H. MUREITHI said no.

Overt Act No. 96:   On or about December 19, 2018, in a telephone call using coded language, Co-conspirator 2 informed defendant H. MUREITHI that the package shipped to Cambridge, Massachusetts had not been delivered.  Defendant H. MUREITHI told Co-conspirator 2 that he would send defendant WANJOHI to Postal Express to check on it.

Overt Act No. 97:   On or about December 19, 2018, not knowing that the December 17, 2018 shipment of oxycodone pills had been seized by law enforcement, defendant WANJOHI visited Postal Express in Anaheim, California at defendant H. MUREITHI's direction and attempted to recover the package from Postal Express.

Overt Act No. 98:   On or about December 19, 2018, in a telephone call using coded language, defendant MABALE explained to defendant BARRIOS that he had sent a package via UPS that had not been delivered and that defendant H. MUREITHI was blaming defendant MABALE for the loss of the package.

1    Overt Act No. 99:   On or about December 19, 2018, in a

2    telephone call using coded language, defendant MABALE told defendant

3    WANJOHI that defendant DELVA had arrived at defendant MABALE's

4    residence.   Defendant WANJOHI responded, "Tell him I will be coming

5    right away."

6    Overt Act No. 100:   On or about December 19, 2019, defendant

7    WANJOHI entered defendant MABALE's residence to meet with defendants

8    MABALE and DELVA.

9    Overt Act No. 101:   On or about December 19, 2018, after leaving

10   defendant MABALE's residence, defendant DELVA possessed 4,389

11   oxycodone pills and two pints of promethazine with codeine.

12   Overt Act No. 102:   On or about December 19, 2018, in a

13   telephone call using coded language, defendants COZART and BARRIOS

14   discussed the disposition of $2,850 in cash that had been paid to the

15   Santa Ana Clinic that day.

16   Overt Act No. 103:   On or about December 20, 2018, in a

17   telephone call using coded language, Capper-1 informed defendant

18   COZART of law enforcement activity related to illicit oxycodone

19   prescriptions, and discussed with defendant COZART how defendant

20   COZART could protect himself from similar law enforcement

21   investigations.   Capper-1 advised defendant COZART, "you gotta be

22   careful.   These people is coming here that don't know the business.

23   You really gotta, you gotta get your game tighter.   'Cause [defendant

24   NAVARCHI] let[s] anybody in.   You need to, you need to be separate

25   from him."   Capper-1 further stated, regarding medical clinics

26   managed by defendant NAVARCHI, "it look[s] like something illegal

27   going on over there."   Capper-1 also recommended that defendant

28

1  COZART shut down the Santa Ana Clinic for a little while "until they
2  find out what's going on."

3      Overt Act No. 104:  On December 20, 2018, in a telephone call
4  using coded language, defendant L. MUREITHI asked defendant H.
5  MUREITHI about the status of his relationship with defendant DELVA.
6  Defendant H. MUREITHI explained that defendant DELVA had apologized,
7  and that defendants H. MUREITHI and DELVA were working together
8  again.   Defendant L. MUREITHI asked whether defendant DELVA paid for
9  oxycodone upfront, and defendant H. MUREITHI said yes.  Defendant L.
10  MUREITHI approved, explaining that there is now "no risk[] while
11  mailing."

12      Overt Act No. 105:  On or about December 21, 2018, in a
13  telephone call using coded language, defendant COZART instructed
14  Physician Assistant-2 to cease communication with Capper-1 and
15  Capper-2 in order to protect herself.  According to defendant COZART,
16  people like Capper-1 and Capper-2 were "supposed to be ghosts" who
17  were "not even supposed to be in the equation."  Defendant COZART
18  also explained that he wanted to "tighten up" protocols including
19  restricting "our doctors" from "communicat[ing] with the patients or
20  the marketers."

21      Overt Act No. 106:  On or about December 26, 2018, in a
22  telephone call using coded language, defendant BARRIOS informed
23  defendant COZART that she had collected $4,100 for fraudulent
24  oxycodone prescriptions written to fourteen sham patients.

25      Overt Act No. 107:  On or about December 27, 2018, in a
26  telephone call using coded language, defendant MABALE confirmed to
27  defendant H. MUREITHI that he planned to collect oxycodone pills that

28

evening, but that an unidentified individual holding 420 oxycodone pills had not returned defendant MABALE's telephone call.

Overt Act No. 108:  On or about December 27, 2018, inside of his residence, defendant MABALE possessed 840 oxycodone pills, $77,580 in cash, and various California identification documents in others' names.

Overt Act No. 109:  On or about December 27, 2018, in a telephone call using coded language, defendant MABALE informed defendant BARRIOS that the Torrance Police Department had searched his residence.  When defendant BARRIOS asked whether they found anything, defendant MABALE said "they took the money and everything." Defendant BARRIOS responded, "Oh my god!"

Overt Act No. 110:  On or about December 28, 2018, in a telephone call using coded language, defendant H. MUREITHI informed defendant L. MUREITHI that law enforcement had searched defendant MABALE's residence pursuant to a search warrant.  Defendant H. MUREITHI informed defendant L. MUREITHI that law enforcement seized 200 oxycodone pills and $80,000 in cash.  Defendant L. MUREITHI advised defendant H. MUREITHI that he should remove any evidence of drug trafficking activity from his residence.

Overt Act No. 111:  On or about December 28, 2018, in a recorded telephone call using coded language, defendant H. MUREITHI explained to defendant L. MUREITHI that the amount of cash seized from defendant MABALE was high because defendant DELVA had just paid defendant MABALE for oxycodone that defendant DELVA had purchased.

Overt Act No. 112:  On or about January 5, 2019, in a text message using coded language, defendant BARRIOS wrote to defendant

1   COZART, "14 paying patients[.] Total 3900[.] I refund[ed] the 300

2   [t]o the lady I told you from yesterday[.]"

3       Overt Act No. 113:  On or about January 6, 2019, defendant

4   BARRIOS deposited $1,250 into the U.S. Bank Account.

5       Overt Act No. 114:  On or about January 8, 2019, in a telephone

6   call using coded language, defendant BARRIOS reported to defendant

7   COZART that the Huntington Park Clinic issued 30 fraudulent oxycodone

8   prescriptions, and that defendant NAVARCHI had also processed 20 "re-

9   writes" of fraudulent oxycodone prescriptions.  When defendant

10  BARRIOS informed defendant COZART that defendant NAVARCHI had given

11  her $2,000, defendant COZART instructed defendant BARRIOS to deposit

12  the money into the U.S. Bank Account.

13      Overt Act No. 115:  On January 12, 2019, in a telephone call,

14  defendant COZART instructed defendant BARRIOS to pay herself and

15  others, including Physician Assistant-2, with cash that had been

16  collected that day, and to deposit the remainder in the U.S. Bank

17  Account.

18      Overt Act No. 116:  On or about January 15, 2019, in a telephone

19  call using coded language, defendant BARRIOS told defendant MABALE

20  that a friend had 88 30mg oxycodone pills but could not sell them

21  because the pills were white rather than blue.  Defendant MABALE

22  asked, "you want me to handle it?"  Defendant BARRIOS responded, "but

23  how much are you paying for them?"

24      Overt Act No. 117:  On or about January 15, 2019, in a telephone

25  call, defendant COZART spoke to an unidentified medical professional

26  seeking recommendations of doctors who would treat cash-paying,

27  narcotic patients of defendant COZART's medical clinics.  With

28  respect to the clientele of his medical clinics, defendant COZART

33

explained, in part, ". . . I also know that they probably sell some of those pills that they get, ya know, in addition to taking them. So, ya know, a lot of pain doctors, they won't wanna, they don't want even want to touch that stuff with a ten foot pole."

Overt Act No. 118:  On or about January 16, 2019, in a telephone call using coded language, defendant COZART explained to defendant BARRIOS that he "cuss[es] out" anyone who sends him text messages regarding fraudulent oxycodone prescriptions.  He further told defendant BARRIOS, "If you're gonna do this kind of business, you gotta learn how to keep your distance."

Overt Act No. 119:  On or about January 17, 2019, in a telephone call, defendant COZART told defendant NAVARCHI that Physician Assistant-2 should not be given any cash because she was always paid by check.  Defendants COZART and NAVARCHI agreed to pay Physician Assistant-2 $1,000 for her services that day.

Overt Act No. 120:  On or about January 17, 2019, in a telephone call using coded language, defendant NAVARCHI informed defendant COZART that one of their medical clinics had written fraudulent oxycodone prescriptions for 28 sham patients at $300 per prescription.  According to defendant NAVARCHI, all of the sham patients were "solid," not "fuckin' crackheads."

Overt Act No. 121:  On or about January 19, 2019, in a telephone call using coded language, defendants H. MUREITHI and MABALE discussed opening their own medical clinic to sell fraudulent oxycodone prescriptions.

Overt Act No. 122:  On or about January 21, 2019, in a text message using coded language, Capper-1 sent the name of a sham patient to Physician Assistant-2 and wrote underneath "oxc and

34

1  juice," referring to promethazine with codeine cough syrup and
2  oxycodone, respectively.

3      Overt Act No. 123:  On or about January 24, 2019, in a telephone
4  call using coded language, defendant COZART advised Physician
5  Assistant-2 that Capper-1 planned to bring ten to fifteen sham
6  patients to a clinic to obtain fraudulent oxycodone prescriptions the
7  next day.  Defendant COZART said that Physician Assistant-2 did not
8  have to see the patients, but could just write the refills.

9      Overt Act No. 124:  On or about January 26, 2019, in a telephone
10 call using coded language, defendant BARRIOS explained to defendant
11 COZART that she has refunded $300 to Capper-12 because he had
12 received a fraudulent prescription for hydrocodone, not oxycodone.
13 Defendants COZART and BARRIOS then discussed the disposition of the
14 cash that had been collected at the medical clinic that day.

15     Overt Act No. 125:  On or about January 28, 2019, in a text
16 message using coded language, Capper-1 wrote to defendant COZART,
17 "Good morning Justin okay [Physician Assisant-2] is going to be in
18 Redondo but the other doctor have a lot of physicals over there so
19 she said she don't know what time she'll be able to meet with the
20 patients so I need you to give me a call when you get this message
21 thank you."

22     Overt Act No. 126:  On or about January 29, 2019, in a text
23 message using coded language, defendant COZART wrote to Capper-1,
24 "The printer will have the scripts redone on Wednesday."

25     Overt Act No. 127:  On or about January 30, 2019, in a telephone
26 call using coded language, defendant BARRIOS told defendant COZART
27 that 19 sham patients visited the medical clinics that day, and that
28

1  Capper-13 brought two sham patients but paid only $500 instead of
2  $600.

3      Overt Act No. 128:  On or about February 2, 2019, in a telephone
4  call using coded language, defendant BARRIOS told defendant COZART
5  that she collected $5,700 from sham patients for fraudulent oxycodone
6  prescriptions.  Defendant BARRIOS told defendant COZART that she was
7  uncomfortable with sham patients referred to the Huntington Park
8  Clinic by defendant NAVARCHI because they had out-of-state
9  identifications.

10      Overt Act No. 129:  On or about February 5, 2019, in a telephone
11  call using coded language, defendant COZART informed Physician
12  Assistant-2 that she would be providing patients pain injections in
13  the future.  Defendant COZART said pain injections would "look[] good
14  for the file" and that it would not appear as if Physician Assistant-
15  2 prescribed only oxycodone to patients.

16      Overt Act No. 130:  On or about February 5, 2019, in a telephone
17  call using coded language, defendant COZART told defendant NAVARCHI
18  that the clinics would begin requiring sham patients to obtain pain
19  injections so it would appear that sham patients were not receiving
20  only oxycodone prescriptions.  Referring to sham patients who falsely
21  claimed to be in pain, defendant COZART said, "I'm gonna make these
22  patients take injections. . . . They wanna be in pain, this and that,
23  you know, you're gonna have to pay the fucking price."

24      Overt Act No. 131:  On or about February 6, 2019, in a telephone
25  call using coded language, defendant NAVARCHI told defendant COZART
26  that thirty sham patients had obtained fraudulent oxycodone
27  prescriptions from a medical clinic in Granada Hills, California.
28  Defendant NAVARCHI told defendant COZART that Capper-1 had yelled at

defendant NAVARCHI because one of Capper-1's sham patients obtained a fraudulent prescription through a different capper. Defendant NAVARCHI purportedly told Capper 1 that he did not know what the cappers were "doing on the street" and did not care. Defendant COZART later commented that that sham patients "push the envelope with the opiates" and can "come right out of it with a fucking Narcan," an emergency medication to treat a narcotic overdose. Defendant COZART said he "did not want the motherfuckers dying on" them because "that's where we run into fucking problems, you know?"

Overt Act No. 132: On or about February 6, 2019, in a telephone call using coded language, Capper-1 told defendant BARRIOS that, when questioned by a pharmacy, defendant KORZELIUS had denied knowledge of prescriptions written under his name and claimed his signature was forged.

Overt Act No. 133: On or about February 6, 2019, in a telephone call using coded language, defendants COZART and NAVARCHI discussed a report that Doctor-1 had advised a pharmacy that he did not know Physician Assistant-2, who was writing fraudulent oxycodone prescriptions under Doctor-1's name. Defendant COZART told defendant NAVARCHI that Doctor-1 had never met Physician Assistant-2. On or about February 6, 2019, in a telephone call, defendant COZART told defendant KORZELIUS that defendant KORZELIUS needed to meet Physician Assistant-2.

Overt Act No. 134: On or about February 7, 2019, in a telephone call using coded language, defendant BARRIOS told defendant COZART that defendant NAVARCHI had provided her $1,250 in cash to pay doctors who had written fraudulent oxycodone prescriptions. Defendant BARRIOS further reported her suspicion that defendant

37

1  NAVARCHI had charged sham patients only $250 for a fraudulent
2  prescription for oxycodone rather than $300.

3      Overt Act No. 135:  On or about February 7, 2019, in a text
4  message using coded language, Capper-1 wrote to defendant COZART,
5  "Good morning Justin this is me calling you [Capper-1] I will not be
6  attending over there.  You can park cuz I don't want to fuck
7  [defendant NAVARCHI's] ass up so I will wait till tomorrow and bring
8  my people over there cuz I'm tired of him putting fake obligations on
9  me and accusing me of something that he don't have facts us and I'm
10  not going to keep putting up with his shit I talk to my husband about
11  him already he got one more time to put my name in his mouth and you
12  going to get fucked over so the keep peace with me and you I will
13  come over to Redondo tomorrow and bring my people there so you'll
14  have to do a special visit for me over there this morning cuz I would
15  not."

16      Overt Act No. 136:  On or about February 7, 2019, in a text
17  message using coded language, Capper-1 wrote in a text message to
18  Physician Assistant-2, "oxy," followed by five sham patient names and
19  birth dates, and "norco/juice," followed by two sham patient names.

20      Overt Act No. 137:  On or about February 8, 2019, in a telephone
21  call using coded language, defendant COZART requested from Capper-1 a
22  list of names and telephone numbers for pharmacies where Capper-1's
23  sham patients filled prescriptions.

24      Overt Act No. 138:  On or about February 8, 2019, in a telephone
25  call using coded language, defendant COZART discussed with Capper-1
26  the pharmacies that filled fraudulent oxycodone prescriptions Capper-
27  1 had obtained using sham patients.  Defendant COZART explained to
28  Capper-1 that defendant COZART did not want pharmacies to call

doctors associated with the medical clinics. Capper-1 informed
defendant COZART that there were no questions asked of Capper-1 when
Capper-1 dropped off fraudulent oxycodone prescriptions. Capper-1
informed defendant COZART that Capper-1 had asked Physician
Assistant-2 to prescribe different medications alongside oxycodone.

Overt Act No. 139: On or about February 18, 2019, in text
messages, Capper-1 sent defendant COZART the names and dates of birth
of six sham patients she intended to bring to the medical clinics to
obtain fraudulent oxycodone prescriptions.

Overt Act No. 140: On or about February 26, 2019, in a text
message using coded language, Capper-1 wrote to Physician Assistant-
2, "Mommy I need for Oxys 120 in the last one or Norco in a juice and
I have the package for you now so I can send me and there to get it."

Overt Act No. 141: On or about November 14, 2019, at the
Inglewood Clinic, defendant COZART met with a sham patient who
defendant COZART believed was referred by defendant MABALE but who
was actually an undercover agent of the Drug Enforcement
Administration ("UC-1"). After UC-1 told defendant COZART that UC-1
had "uncomfortableness in [UC-1's] back" from exercising, defendant
COZART told UC-1 that defendant COZART would indicate in UC-1's file
that UC-1 suffered from "compressed discs" and "pinched nerves" in
UC-1's lower back.

Overt Act No. 142: On or about November 14, 2019, at the
Inglewood Clinic, after UC-1 told defendant KORZELIUS that UC-1
suffered from "uncomfortableness" in UC-1's lower back from
exercising and without conducting a physical examination, defendant
KORZELIUS issued UC-1 a prescription for 60 30mg oxycodone pills and

1  instructed UC-1 not to fill the prescription at a large pharmacy like

2  Walmart or CVS.

3      Overt Act No. 143:  On or about November 14, 2019, at the

4  Inglewood Clinic, defendant COZART called UC-1 out of the reception

5  area and into a side room where he collected $300 in cash from UC-1.

6  Defendant COZART instructed UC-1 to return in one month, at around

7  2:00 p.m., to avoid the wait.

8      Overt Act No. 144:  On or about December 19, 2019, at the

9  Inglewood Clinic, defendant COZART questioned UC-1 about UC-1's

10  medical history and symptoms, to which UC-1 explained UC-1 suffered

11  from discomfort in UC-1's lower back.

12      Overt Act No. 145:  On or about December 19, 2019, at the

13  Inglewood Clinic, defendant KORZELIUS asked UC-1 whether UC-1 had any

14  difficulty filling the prior prescription.  Without conducting a

15  physical examination, defendant KORZELIUS issued UC-1 another

16  prescription for 60 30mg oxycodone pills.

17      Overt Act No. 146:  On or about December 19, 2019, defendant

18  COZART entered the examination room and collected a $300 cash payment

19  from UC-1.  Defendant COZART instructed UC-1 to return in a month at

20  the same time.

21      Overt Act No. 147:  On or about January 30, 2020, at the

22  Inglewood clinic, defendant COZART met with an individual who he

23  believed was a sham patient but who was in fact an undercover officer

24  of the Costa Mesa Police Department ("UC-2").  Defendant COZART took

25  a medical history from UC-2.  UC-2 told defendant COZART that he was

26  not suffering from any work or sports related injury.

27      Overt Act No. 148:  On or about January 30, 2020, at the

28  Inglewood clinic, without conducting any physical examination,

defendant KORZELIUS issued UC-2 a prescription for 60 30mg oxycodone pills.

Overt Act No. 149:   On or about January 30, 2020, at the Inglewood clinic, defendant COZART collected $300 in cash from UC-2 for the fraudulent oxycodone prescription.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

[DEFENDANTS H. MUREITHI AND MABALE]

8.    On or about October 15, 2018, in Orange County, within the Central District of California, defendants HARRISON MARUJE MUREITHI, also known as ("aka") "Paul," "P," and "Mzito," and XAVIER MUDUKI MABALE, aka "X," "Zash," and "Mluhya," each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute oxycodone, namely, 13,677 pills of 30mg oxycodone, a Schedule II narcotic drug controlled substance.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

[DEFENDANTS H. MUREITHI, MABALE, AND WANJOHI]

9.   On or about December 17, 2018, in Orange County, within the Central District of California, defendants HARRISON MARUJE MUREITHI, also known as ("aka") "Paul," "P," and "Mzito," XAVIER MUDUKI MABALE, aka "X," "Zash," and "Mluhya," and DUNCAN MUTHONI WANJOHI, aka "Ziggy," "Little Duncan," "Cuzo," and "Irungu," each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute oxycodone, namely, 1,831 pills of 30mg oxycodone, a Schedule II narcotic drug controlled substance.

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

[DEFENDANTS MABALE AND WANJOHI]

10.   On or about December 19, 2018, in Orange County, within the Central District of California, defendants XAVIER MUDUKI MABALE, also known as ("aka") "X," "Zash," and "Mluhya" and DUNCAN MUTHONI WANJOHI, aka "Ziggy," "Little Duncan," "Cuzo," and "Irungu," each aiding and abetting the others, knowingly and intentionally distributed oxycodone, namely, 4,389 pills of 30mg oxycodone, a Schedule II narcotic drug controlled substance.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

[DEFENDANT MABALE]

11.   On or about December 19, 2018, in Orange County, within the Central District of California, defendant PIERRE DELVA, JR., aka "Big Head," knowingly and intentionally possessed with intent to distribute oxycodone, namely, 4,389 pills of 30mg oxycodone, a Schedule II narcotic drug controlled substance.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

[DEFENDANT MABALE]

12.   On or about December 27, 2018, in Orange County, within the Central District of California, defendant XAVIER MUDUKI MABALE, also known as "X," "Zash," and "Mluhya," knowingly and intentionally possessed with intent to distribute oxycodone, namely, 840 pills of 30mg oxycodone, a Schedule II narcotic drug controlled substance.

COUNT SEVEN

[18 U.S.C. § 1956(h)]

[DEFENDANTS H. MUREITHI, MABALE, WANJOHI, DELVA, AND BARRIOS]

13.  Paragraphs 1 through 4, and 6 of this Indictment, are re-alleged here.

A.  OBJECTS OF THE CONSPIRACY

14.  Beginning no later than August 3, 2018 and continuing to at least January 19, 2019, in Los Angeles, Orange, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants HARRISON MARUJE MUREITHI, also known as ("aka") "Paul," "P," and "Mzito" ("H. MUREITHI"), XAVIER MUDUKI MABALE, aka "X," "Zash," and "Mluhya," DUNCAN MUTHONI WANJOHI, aka "Ziggy," "Little Duncan," "Cuzo," and "Irungu," PIERRE DELVA, JR., aka "Big Head," and MAYRA BARRIOS, and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally conduct and attempt to conduct financial transactions, affecting interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and which property, in fact, involved the proceeds of specified unlawful activity, that is, conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846:

a.  with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b.  knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of such

47

1  specified unlawful activity, in violation of Title 18, United States
2  Code, Section 1956(a)(1)(B)(i).
3  B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
4       ACCOMPLISHED
5       15.   The objects of the conspiracy were to be accomplished, in
6  substance, as follows:
7            a.   Defendants H. MUREITHI, MABALE, WANJOHI, DELVA, and
8  BARRIOS would agree to engage in the distribution of oxycodone as
9  alleged in Paragraph 6 of this Indictment, including all
10 subparagraphs.
11           b.   Defendant H. MUREITHI would instruct defendant DELVA
12 and others to deliver bulk cash payments to defendant H. MUREITHI's
13 residence and others' residences, including Louise W. Mureithi's ("L.
14 Mureithi") residence.
15           c.   Defendant H. MUREITHI would provide a portion of the
16 cash proceeds from the sale of oxycodone to defendants MABALE and
17 WANJOHI to purchase additional oxycodone from others who had acquired
18 it from the black market.
19           d.   Defendant H. MUREITHI would also provide a portion of
20 the cash proceeds from the sale of oxycodone to defendant MABALE to
21 pay for prescriptions for oxycodone written in the name of sham
22 patients by medical clinics.
23           e.   Defendant MABALE would pay cash to defendant BARRIOS
24 to purchase fraudulent oxycodone prescriptions for oxycodone in the
25 name of sham patients.
26           f.   Defendant BARRIOS would notify defendant MABALE of any
27 outstanding debts owed to the medical clinics that would prevent sham
28

1  patients from receiving fraudulent oxycodone prescriptions for
2  oxycodone.

3         g.  Defendant MABALE would notify defendant BARRIOS about
4  the anticipated arrival date of shipments of cash proceeds that would
5  be used to pay outstanding debts for fraudulent oxycodone
6  prescriptions so that defendant BARRIOS could expedite the release of
7  any fraudulent oxycodone prescriptions that were being withheld.

8  C.  OVERT ACTS

9      16.  On or about the following dates, in furtherance of the
10 conspiracy and to accomplish the objects of the conspiracy,
11 defendants H. MUREITHI, MABALE, WANJOHI, DELVA, and BARRIOS, and
12 others known and unknown to the Grand Jury, committed various overt
13 acts within the Central District of California, and elsewhere,
14 including, but not limited to, the following:

15     Overt Act No. 1:   On or about September 18, 2018, in a
16 telephone call using coded language, defendant WANJOHI advised
17 defendant H. MUREITHI of a $14,000 withdrawal defendant WANJOHI made
18 at the bank and that defendant WANJOHI had obtained a cashier's check
19 for $8,550.  Defendant WANJOHI also updated defendant H. MUREITHI on
20 the quantities of oxycodone available from various cappers.

21     Overt Act No. 2:   On September 19, 2018, in a telephone call
22 using coded language, defendants H. MUREITHI and MABALE discussed
23 defendant MABALE's use of $20,000 to purchase 1,379 oxycodone pills.
24 Defendant H. MUREITHI instructed defendant MABALE to purchase an
25 additional $5,000 in oxycodone pills.

26     Overt Act No. 3:   On September 19, 2018, in a telephone call
27 using coded language, defendants H. MUREITHI and WANJOHI discussed
28 how defendant WANJOHI disbursed $125,000 that he had received to

purchase oxycodone from various cappers.   Defendant WANJOHI also
informed defendant H. MUREITHI that defendants WANJOHI and MABALE
intended to purchase fraudulent oxycodone prescriptions at the
Fontana Clinic the next day.

Overt Act No. 4:   On or about September 19, 2018, in a
telephone call using coded language, defendants H. MUREITHI and
MABALE discussed the quantity of oxycodone pills defendant MABALE
planned to purchase from other cappers.   Defendant H. MUREITHI also
told defendant MABALE that defendant H. MUREITHI would bring $10,000
to the Fontana Clinic so that defendant MABALE could pay sham
patients.

Overt Act No. 5:   On or about September 22, 2018, in a
telephone call using coded language, defendant H. MUREITHI explained
to defendant MABALE that he (defendant H. MUREITHI) would count the
cash received from the sale of oxycodone, keep $20,000 for himself,
and provide the remainder to defendant MABALE.   Defendant H. MUREITHI
instructed defendant MABALE to use some of the cash to purchase
oxycodone from Capper-7.

Overt Act No. 6:   On or about October 3, 2018, in a telephone
call using coded language, defendant MABALE told defendant H.
MUREITHI that he prefers sham patients to visit the Santa Ana Clinic
rather than the Fontana Clinic because the doctor "writes what he is
told."   Defendants H. MUREITHI and MABALE then discussed cash given
to defendant MABALE to obtain fraudulent oxycodone prescriptions.

Overt Act No. 7:   On or about October 10, 2018, in a telephone
call using coded language, Capper-8 advised defendant H. MUREITHI
that she had collected 1,725 pills of oxycodone and expected to
receive additional quantities in the next few days.   Defendant H.

50

1   MUREITHI said that he would have $30,000 or $40,000 in cash available

2   to use to purchase any oxycodone pills Capper-8 could collect.

3       Overt Act No. 8:   On or about October 13, 2018, in a telephone

4   call using coded language, defendant H. MUREITHI advised defendant

5   WANJOHI that three cappers, including Capper-8, were owed $56,277,

6   $10,070, and $19,000, respectively, for oxycodone that had been

7   purchased from them.   Defendant H. MUREITHI also advised defendant

8   WANJOHI that he would replenish defendant WANJOHI's cash supply with

9   hundred dollar bills.

10      Overt Act No. 9:   On or about October 15, 2018, in a telephone

11  call using coded language, defendant H. MUREITHI instructed L.

12  Mureithi to withdraw $7,000 from an unspecified bank account.

13  Defendant H. MUREITHI explained that when cappers call him to sell

14  oxycodone, "you cannot tell them you do not have money."   Defendant

15  H. MUREITHI further explained that, every ten days, he typically

16  spent $180,000 to purchase oxycodone pills.

17      Overt Act No. 10:   On or about November 11, 2018, in a

18  telephone call using coded language, defendants H. MUREITHI and

19  MABALE discussed a package of oxycodone pills that had not arrived in

20  Massachusetts.   Defendant H. MUREITHI said that defendant DELVA would

21  loan $200,000 to them and that defendant MABALE should use $50,000 of

22  that sum to purchase oxycodone pills.   Defendant H. MUREITHI also

23  instructed defendant MABALE to stop advancing cash to cappers from

24  whom defendant MABALE purchased oxycodone pills.

25      Overt Act No. 11:   On or about November 12, 2018, in a

26  telephone call using coded language, defendant BARRIOS explained to

27  defendant MABALE that Justin Cozart ("Cozart") had forbidden her from

28

1    providing fraudulent oxycodone prescriptions to defendant MABALE

2    until defendant MABALE paid an outstanding balance of $600.

3        Overt Act No. 12:   On or about November 13, 2018, in a

4    telephone call using coded language, defendants H. MUREITHI and

5    MABALE discussed ten new sham patients who would obtain fraudulent

6    oxycodone prescriptions from Cozart's medical clinics.   Defendant

7    MABALE said that Cozart was upset over an outstanding balance owed

8    for fraudulent oxycodone prescriptions.   Defendant H. MUREITHI said

9    that he expected to receive a shipment of cash from which defendant

10   MABALE could pay the outstanding balance to Cozart, plus the cost of

11   fraudulent oxycodone prescriptions for the ten new sham patients.

12       Overt Act No. 13:   On or about November 13, 2018, in a

13   telephone call using coded language, defendant H. MUREITHI instructed

14   defendant WANJOHI to provide $10,000 to $20,000 to defendant MABALE

15   for the purchase of oxycodone pills.   Defendant H. MUREITHI informed

16   defendant WANJOHI of a new cash-on-delivery policy, replacing a

17   practice of "giving people money up front to go get" oxycodone pills.

18   Defendant H. MUREITHI also informed defendant WANJOHI that defendant

19   DELVA would be delivering $100,000 in cash to defendant H. MUREITHI

20   over the weekend.

21       Overt Act No. 14:   On or about November 14, 2018, in a

22   telephone call using coded language, defendants H. MUREITHI and

23   MABALE discussed an incoming shipment of cash which defendant H.

24   MUREITHI intended to use to pay Cozart.   Defendant H. MUREITHI said

25   to defendant MABALE, "Put [Cozart] on the phone with me and I will

26   tell him, 'listen, there is something I'm waiting for and the minute

27   I get it, I'm on my way to you.   You will get paid in full.'"

28

1    Overt Act No. 15:   On or about November 14, 2018, in a
2  telephone call using coded language, defendants MABALE and BARRIOS
3  discussed a $600 debt defendant MABALE owed to defendant COZART for
4  fraudulent oxycodone prescriptions.   Defendant MABALE advised
5  defendant BARRIOS that defendant HARRISON was waiting on a shipment
6  of cash proceeds from which defendant MABALE would pay the
7  outstanding debt owed to defendant COZART.

8    Overt Act No. 16:   On or about November 14, 2018, in a
9  telephone call using coded language, defendant H. MUREITHI advised
10  defendant MABALE that he had received a shipment of cash.   Defendant
11  H. MUREITHI instructed defendant MABALE to count the cash using a
12  money counter and to keep the doors of his home closed while he did
13  so.   Defendant MABALE then advised defendant H. MUREITHI that cappers
14  would not provide oxycodone pills to defendant MABALE until they were
15  paid.

16    Overt Act No. 17:   On or about November 25, 2018, in a
17  telephone call using coded language, defendant H. MUREITHI told
18  defendant MABALE that a package of oxycodone pills had been received
19  in Massachusetts and that defendant H. MUREITHI would likely receive
20  cash payment soon, perhaps via next-day shipment.   Defendants H.
21  MUREITHI and MABALE then discussed cappers who had oxycodone
22  available for purchase.

23    Overt Act No. 18:   On or about November 27, 2018, in a UPS
24  parcel addressed to a fictitious person with initials R.E., defendant
25  DELVA shipped approximately $100,000 in cash to defendant HARRISON's
26  residence.

27    Overt Act No. 19:   On or about November 28, 2018, in a
28  telephone call using coded language, defendants H. MUREITHI and

MABALE discussed a Federal Express package containing cash that had been delivered to defendant MABALE. Defendant H. MUREITHI instructed defendant MABALE to meet defendant H. MUREITHI at the Santa Ana Clinic with the cash.

Overt Act No. 20: On or about November 29, 2018, in a telephone call using coded language, defendants H. MUREITHI, MABALE, and WANJOHI discussed the purchase of oxycodone pills from cappers. Defendant H. MUREITHI said that defendant DELVA was delivering cash to defendant H. MUREITHI, and that defendant H. MUREITHI would then pay defendants MABALE and WANJOHI for the oxycodone pills they had purchased from cappers.

Overt Act No. 21: On or about December 4, 2018, in a telephone call using coded language, defendant H. MUREITHI advised L. Mureithi that he expected to receive a package containing cash and would meet with L. Mureithi after receiving it. Defendant H. MUREITHI instructed L. Mureithi to pay $11,600 to defendant WANJOHI.

Overt Act No. 22: On or about December 4, 2018, in a telephone call using coded language, defendant WANJOHI told defendant H. MUREITHI that he had $92,830 in cash on hand.

Overt Act No. 23: On or about December 27, 2018, inside of his residence, defendant MABALE possessed 840 oxycodone pills, $77,580 in cash, and various California identification documents in others' names.

COUNT EIGHT

[18 U.S.C. § 1956(h)]

[DEFENDANTS COZART AND NAVARCHI]

17.   Paragraphs 1 through 4, and 6 of this Indictment, including all subparagraphs and overt acts, are re-alleged here.

A.   OBJECT OF THE CONSPIRACY

18.   Beginning no later than August 15, 2018 and continuing to at least October 19, 2019, in Los Angeles, Orange, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants JUSTIN DOUGLAS COZART and DAMOON JOE NAVARCHI, also known as "Joey," and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally conduct and attempt to conduct financial transactions, affecting interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and which property, in fact, involved the proceeds of specified unlawful activity, that is, conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

19.   The object of the conspiracy was to be accomplished, in substance, as follows:

a.   Defendant COZART would open the U.S. Bank Account in the name of AJMC Holdings, Inc. without disclosing, on account opening documents or through corporate formation documents, that U.S. Bank Account would receive deposits that represented proceeds of a medical clinic.

b.   Defendants COZART and NAVARCHI would deposit, or cause others to deposit, cash proceeds of the sale of fraudulent oxycodone prescriptions into the AJMC Holdings, LLC U.S. Bank Account.

c.   Defendant COZART would deposit money earned from other sources unrelated to the medical clinic into the AJMC Holdings, Inc. U.S. Bank Account.

d.   Defendant COZART would issue checks drawn on the AJMC Holdings, Inc. U.S. Bank Account to defendant NAVARCHI representing a portion of defendant NAVARCHI's proceeds from the sale of fraudulent oxycodone prescriptions at the medical clinics.

e.   Defendant COZART would use the AJMC Holdings, Inc. U.S. Bank Account to pay expenses of the medical clinics, for other business ventures, and for personal expenses.

C.   OVERT ACTS

20.   On or about the following dates, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants COZART and NAVARCHI, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On or about November 19, 2018, Mayra Barrios ("Barrios") deposited $8,400 into the U.S. Bank Account.

Overt Act No. 2: On or about November 19, 2018, defendant COZART issued a check to John Michael Korzelius in the amount of $4,000 drawn on the U.S. Bank Account.

Overt Act No. 3: On or about November 30, 2018, in a telephone call using coded language, defendants COZART and NAVARCHI agreed to split between themselves $3,000 that Capper-2 had paid for fraudulent oxycodone prescriptions.

Overt Act No. 4: On or about December 5, 2018, in a telephone call using coded language, defendants COZART and NAVARCHI discussed the number of sham patients various cappers brought to the medical clinics and agreed to split amongst themselves $4,200 that Barrios planned to deposit into the U.S. Bank Account.

Overt Act No. 5: On or about December 11, 2018, in a telephone call using coded language, defendants COZART and NAVARCHI discussed $5,100 in cash that had been earned that day at two medical clinics. Defendant NAVARCHI also told defendant COZART that some of Capper-1's sham patients had visited the medical clinics without Capper-1.

Overt Act No. 6: On or about January 6, 2019, Barrios deposited $1,250 into the U.S. Bank Account.

Overt Act No. 7: On or about January 8, 2019, in a telephone call using coded language, Barrios reported to defendant COZART that the Huntington Park Clinic issued 30 fraudulent oxycodone prescriptions, and that defendant NAVARCHI had also processed 20 "re-writes" of fraudulent oxycodone prescriptions. When Barrios informed defendant COZART that defendant NAVARCHI had given her $2,000, defendant COZART instructed Barrios to deposit the money into the U.S. Bank Account.

1    Overt Act No. 8:    On January 12, 2019, in a telephone call,

2    defendant COZART instructed Barrios to pay herself and others,

3    including Physician Assistant-2, with cash that had been collected

4    that day, and to deposit the remainder in the U.S. Bank Account.

5    Overt Act No. 9:    On or about January 17, 2019, in a telephone

6    call, defendant COZART told defendant NAVARCHI that Physician

7    Assistant-2 should not be given any cash because she was always paid

8    by check.   Defendants COZART and NAVARCHI agreed to pay Physician

9    Assistant-2 $1,000 for her services that day.

COUNTS NINE AND TEN

[18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. §§ 2(a), (b)]

[DEFENDANTS COZART and NAVARCHI]

21.   The Grand Jury re-alleges paragraphs 1 through 4, 6, and 19 of this Indictment, including all subparagraphs and overt acts, here.

22.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants JUSTIN DOUGLAS COZART and DAMOON JOE NAVARCHI, aka "Joey," and others known and unknown to the Grand Jury, conducted, aided and abetted the conducting of, and willfully caused others to conduct, the following financial transactions affecting interstate and foreign commerce, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which transactions, in fact, involved the proceeds of specified unlawful activity, that is, the unlawful distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| Count | Defendant | Date | Transaction |
|-------|-----------|------|-------------|
| NINE | COZART and NAVARCHI | 11/19/2018 | Payment of $3,240 to defendant NAVARCHI via check (#1183) drawn on AJMC Holdings, LLC's U.S. Bank Account |
| TEN | COZART and NAVARCHI | 11/28/2018 | Cash deposit of $2,000 into AJMC Holdings, LLC's U.S. Bank Account |

FORFEITURE ALLEGATION ONE

[21 U.S.C. § 853]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853 and Title 28, United States Code, Section 2461(c), in the event of any of the defendants' conviction of the offenses set forth in any of Counts One through Six of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from any such offense, including but not limited to: the real property located at 1450 Shire Place, Norco, CA 92860, with Assessor's Parcel Number: 168-300-038-7;

(b)   All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any such offense; and

(c)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.   Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted, shall forfeit substitute property if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located

upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of any defendants' conviction of the offenses set forth in any of Counts Seven through Ten of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a). Any property, real or personal, involved in such offense, and any property traceable to such property, including but not limited to: the real property located at 1450 Shire Place, Norco, CA 92860, with Assessor's Parcel Number: 168-300-038-7; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be

62

divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

A TRUE BILL



_____
Foreperson

NICOLA T. HANNA
United States Attorney

Scott M. Garringer
Deputy Chief, Criminal Division For:

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office

JENNIFER L. WAIER
Assistant United States Attorney
Deputy Chief, Santa Ana Branch
Office

SCOTT D. TENLEY
Assistant United States Attorney
Santa Ana Branch Office